We are ready to hear from you, Mr. Boudin, you should assume, of course, that we have got the case well in mind from the thorough briefing. Good morning, may it please the Court. The District Court erred in finding that AMF lacks standing because the 2004 License Agreement retained substantial rights and obligations to AMF. Would you agree that if AB could give a license to a defendant the day after the defendant is sued by AMF, that that would be fatal to your standing? If there were an unfettered right to sub-license, I think that's true, but in this case Forget about unfettered v. fettered, I'm giving you a very specific case. If AB, having elected not to sue itself, observed that AMF filed a complaint against the Michelle Company, under this agreement could AB grant a license to Michelle Company and thereby negate the lawsuit that AMF has just filed? No, it could not, Your Honor. But the question was, if it could, wouldn't that be fatal to your case? Yes, it would, but that's a different set of circumstances. So then the question is, given the language of 2.1, on what basis do we conclude that AB couldn't fore-license the AMF infringement defense? We look at Section 11.3.1, Your Honor, and Section 11.3.1 says, if AB elects not to sue, then AMF will control all litigation and settlement strategy and tactics. And therefore, there is no right to sub-license once there's an infringement. Once there's a lawsuit filed, Section 11.3.1 divests AB of the right to grant sub-licenses. Why is that? Because it says that AMF will control all litigation. I know what it says. I understand it says it controls litigation. And it controls the settlement. It picks the lawyers, and it decides on the tactics, and it writes the briefs and the pleadings and all that. That's all uncontested. But you seem to be reading into the word control that somehow that means that he who can license anybody, apparently, under 2.1, can't license the defendant once AMF has sued that defendant. Well, I think there's a problem with that assumption, and that is the right to sub-license doesn't come from Section 2.1. Section 2.1 is the grant of the license, the license to practice. In passing, Section 2.1 mentions that there's also a right to grant sub-licenses. And the right to grant sub-licenses is found in Section 2.6. I stand corrected. And Section 2.6 says something different. Section 2.6, and I think that this is you. It talks about affiliates. We know. But aren't you reading some language from 2.1 about sub-licenses right out of the agreement? No. There's no restriction. It doesn't say it can issue sub-licenses to its affiliates. It just says sub-licenses, period. Section 2.1 isn't the sub-licensing grant. It's the grant of the initial license. But you've got a problem. I mean, there are all sorts of references to sub-licenses in this agreement. I think to view that as being confined to affiliates is a pretty weak argument. But why don't you assume for the moment that AB had the right to generally sub-license? And if I understand it correctly, you're saying, but it didn't have the right to do so once a suit was commenced by the patentee, because of the use of the word control, giving the patentee the right to control the suit. So that would restrict the right to sub-license as part of a settlement. You're making that argument, and if I understand your other argument, is that 2.6 confines them to running a license that produces the royalties that are required under the agreement, and that that under Abbott makes a difference. Right? Those are the two arguments. That's correct, Your Honor, because AB cannot, it's not an unfettered right to sub-license. In our view, it's first, it's a right to license affiliates, and then secondly- What about license? If somebody's infringing, say I'm infringing the patent, and AB sues me, I'm not an affiliate. AB sues me, the suit isn't going well, and AB and I decide to settle. And as a part of the settlement, AB grants me a license, but I'm not an affiliate. So under your logic, they can't do that. They can't grant a license to an infringement defendant to settle a case, because the infringement defendant, I'm stipulating, is not an affiliate. Actually, Your Honor, in section 11.2 and 11.3 talk of the infringement with a capital I, a defined term in the agreements, and it says that infringements are by third parties, third parties being others than AMF, AB, or affiliates. And so in both 11.2.2 and 11.3.2, there's a suggestion that further licenses can be granted. And if you look at it, it says any license, sub-license, or cross-license of any AMF, Cochlear technology, that results from a settlement or judgment is subject to section 2.6. So I think licensing and sub-licensing are different depending on whether they're in the context of litigation, that is, an infringement, or whether they're in the context of just sub-licensing to an affiliate. You know, as I look at it, it seems to me there's no question but that the plain meaning and the intention was that the sub-license right was limited to affiliates. But what I find curious, here we have this great debate initiated by a party that had no relationship to this license. So the argument is, what does it mean? The meaning of a legal document or of a contract is controlled, I should think, by the intention of the parties. And it would seem to me that what that contract means is something to be resolved between AMF and AB if it's in dispute. Has there been any attempt at clarification to say, well, now that we look back at it, the trial judge was able to read the contract as others might to extend the sub-license right. So it's not limited to affiliates. Isn't that an easy answer in terms of what the contract interprets unless there's a dispute between the parties as to what was intended to be included in the sub-license right? I don't think that there's a dispute between the parties. Well, not the parties to the contract. Well, I mean as to the parties to the contract. AB had notice of the filing of the lawsuit. Prior to that, AB had been notified of the infringement and had- But do they put in an affidavit or testimony as to how they understood the contract? There is the Griner Declaration in the record. And what does it say? And the Griner Declaration- If I may, just a minute. The Griner Declaration was- I think I can answer that just generally. The Griner Declaration said that in May of 2007, Mr. Griner and Alfred Mann, who was the co-CEO- Who's Griner? Griner is the co-CEO of AB. And Mr. Griner says that in 2007, he and Mr. Mann, who was also the co-CEO of AMF, discussed the infringement. And they agreed that AB would elect not to sue. Yeah, yeah, but that's all very interesting. But I think what Judge Newman is asking you is what did AB tell us about their understanding of the terms of the agreement that we are confronted with today? Griner apparently was deposed at 536. There seems to be an excerpt from his deposition. Did he tell us anything about how he understood the agreement? I think other than in the declaration, there's no real explanation of what he thought that the agreement was. But as I said, AB had knowledge that AMF- So he didn't say anything in the declaration about what the agreement meant either? He didn't address it in detail, no, Your Honor. That seems kind of odd. So we have no participant's understanding of the effect of the agreement? We also have in the record the Hankin Declaration. And Mr. Hankin is the CEO of AMF. And he also says that he spoke to Mr. Mann, who is co-CEO of AB, and Mr. Mann said that AB was electing not to sue. Yeah, yeah, that's on the facts of this case. But the question is when the two parties negotiated the agreement, what did each of them understand the agreement did? Well, there's no record of that, Your Honor. Well, that's what I'm trying to clarify. My understanding is we have no evidence of testimony, declaration, disposition, or anything else of what any negotiator of the agreement thought he was signing onto, right? I think that's correct. Now, there may be testimony in the record of Mr. Hankin as to his belief because he was involved in negotiation of the license agreement. Well, it's not cited in the briefs by either side. But the agreement, I mean, we should be able to look at the agreement and divine the intent of the parties. And here you've got some standards. Sometimes you can and sometimes you can't. That's why sometimes testimony is allowed in order for a contract to be interpreted. Well, that's just to pursue the line I was raising. It seems to me that however one wants to interpret some of the more general references to sublicense, that the agreement is clear that if AB declines to sue, that AMF has the right to sue. And so accepting that, the problem, it seems to me, is really a different one in that these are separate steps. On the one hand, we have, I think, a clear agreement from the contract without trying to go outside it for interpretation that AB declined to sue for whatever reason, I assume because of its current affiliation or ownership, and that therefore AMF certainly has the right to sue. But the problem, and I think that this is what concerned the district court, is whether having the right to sue, it was also necessary that AB be a party to the suit. Now isn't that a separate issue as to AB, if they declined to be a party voluntarily, if because of this accepting that the sublicense right is as broad as the trial judge thought it was, that perhaps there is a good argument that AB could nevertheless somehow enter and intervene, file its own suit, or do something else which would put this defendant, this accused infringer, at risk. Now that's the reason, as I understand it, why we've developed this quite elaborate structure that exclusive licensees can sue, non-exclusive licensees, what if it depends, but probably not, because there are others that could also sue this same defendant based on their undivided interest in the property. So it seems to me that whether it's a simpler or more difficult question, I don't know, but isn't the real issue whether or not AB should have been joined as perhaps a reluctant party defendant rather than joining in the suit? I can tell you that really is what all of these rules are, and in looking back at the 1999 contract, there was an explicit provision whereby either party is to this contract agreed, that if they were required to join in any litigation they would, and that I think was not carried over to the subsequent contract. The 99 agreement said that AMF could be joined, and I think that I see that my time is about to expire. Don't worry about the time. Okay, it seems that that's putting the case law backwards. The case law says that the patentee can be joined, the party who is the licensor can be joined as a reluctant plaintiff, and I don't think here where you've got a case where it's not the patentee that didn't join, it's the licensee that didn't join. In all the case law that I've seen, other than perhaps the Aspects case, it was always the licensee suing, and then the question is, were all substantial rights transferred from the licensor to the licensee? In this case, the licensor, AMF, sued. You have a licensee that the trial judge, and must have been debated before the district court, says no, the licensee has a right to sue in its own name, and therefore the patentee has no right. The district court judge said yes, the licensee has the right to sue because all substantial rights passed under the 2004 agreement. Is that the situation in which perhaps they say all substantial rights passed, or that there were enough rights retained so that the patentee would have been a necessary party? I think he said that the patentee had no standing to sue. He said no standing? That's right. That was really my question. It seems to me that the question isn't one of standing. It's the question of joinder, so that all potentially interested parties are clearly bound by whatever comes out of this suit. And I would agree with Your Honor that if AB had brought this lawsuit, then the question of whether AMF should have been joined would be raised. But I don't think that the question has been raised, does AB have to be a party to this? You never sought to bring in AB as a party? We did not. We did not. And nor did the defendants say that AB had to be a party. Well, you don't expect the defendant to cure a defect. No. The defendant said AB was the only party that had the right to sue. And we dispute that because we believe that there are substantial rights. Well, the contract gives AMF the right to sue. Now, I think it's quite interesting to say that if AB gives AMF the right to sue in the contract, nonetheless, for the trial court to say that's too bad doesn't count. The trial court found that all substantial rights had been given to AB, and it found that the right to sue was illusory. And I don't believe that to be the case. I think the contract spends two paragraphs talking about AMF's right to sue. This case is just like either Abbott or Asymmetrics in which rights are retained on behalf of the patentee, sufficient that the patentee still has rights to sue under the patents that it owns. So we would ask that you reverse the district court and remand for proceedings consistent with reversing. All right, we'll restore the three minutes of rebuttal time you sought to reserve, and we'll hear now from Mr. Chapman. Good morning, Chief. Good morning, Your Honors. Welcome to the court. May it please the Court, Bruce Chapman of Connelly Boeve Lodge and Huts for Cochlear Limited and Cochlear Corporation. I'd like to start- How do you distinguish Abbott? It seems to me you've got a big problem with Abbott, in the sense that in Abbott we held that the fact that a sublicense could not be granted without a royalty meant that not all substantial rights had been transferred. I think the big difference between Abbott in this case is the amount of control that passed to AB over the first right to sue. In this case, it's absolute, all control is- So AB can't grant a royalty-free license, right? That's correct. In Abbott, Abbott was not allowed to do anything that put the patents at risk, or I'm not sure of the exact language, but that essentially would result in the invalidity of patents. And also the provision in Abbott said that Abbott could not settle for less than 1% of the total of the infringing sales, and that's considerably different than the provision in this agreement, which says that AB is explicitly authorized to settle for no money. So I think that- Wait a second. There's a specific reference to 2.6 in connection with the settlement provision. Are you suggesting that they can settle a lawsuit for- they can grant a license as part of a lawsuit for no money? I think if they grant a formal license, they can't grant it for no money. But, for example, what could happen would be a license for going forward, and all the past infringement is essentially settled for no money. I think there could be various stipulations as to outcome. For example, if you had cross claims where one party's suing the other for infringement, both sides might stipulate to no infringement for a judgment. Now, I agree that's an unusual provision in a license like this, but one of the things that you need to remember is that AMF is a substantial owner of AB, so situations could arise- Yeah, but I don't think you've distinguished this from Abbott, and particularly the way Abbott was construed in Speedplay, which distinguished Abbott as a situation in which there was not the right to grant an unfettered license. That is, they had to charge for the license. And in Speedplay, they said, no, they don't. They don't have to charge for the license. So this seems to be on the Abbott side of that line. Well, I think the- first, I'll try and finish addressing Abbott, and then I'll go to Speedplay. The provision in Abbott said that you could not accept less than 1% of the infringing amounts as damages, and Speedplay cited that provision in Abbott as the requirement that, no, you could not grant royalty-free licenses. So I think if you look at that provision in Abbott, which is what the Speedplay argument comes from, it's a distinctly different situation. What it says in Speedplay is Speedplay can render that right nugatory by granting the alleged infringer a royalty-free sublicense. Although the licensee in Abbott could grant sublicenses, its right to do so was not unfettered because it was liable for annual royalties on the sale. That same thing is true here, right? That is correct. Although when you look at the Abbott provision that that statement in Speedplay relies on, it's a significantly- it's actually 180-degree different provision. And the other thing in Speedplay is Speedplay was a- the consideration was all paid up front in that license. So to put a royalty restriction in Speedplay would have been a significant restriction by a patent owner. And here what we have is both an up-front payment in stock plus a running royalty. And I believe that the provision in the license between AMF and AB is there only to protect the royalty stream, which I think puts it in the Ruth versus Westcott situation, where all they're doing is ensuring the compensation for the agreement and not into the Speedplay situation where putting a royalty on a license would have been exercising significant control. You said in your brief that the powers of AB are so extensive that if AB sued somebody for infringement, they could turn around and stipulate that the patent on which they had just filed suit was invalid. I believe that's correct. How could you square that with the duty of fair dealing and honest behavior of these two contracting parties who are sharing in the enforcement of the patents, sharing in licensing revenue, sharing in damages coming from the lawsuits, whichever one of them controlled it? How can it possibly be that the licensee can stipulate in a lawsuit that the patents are invalid? Well, I think the good faith argument is something they specifically negotiated when they came up with this term that allows any judgment or settlement whatsoever within the control of AB, whether or not for money. So I don't see that as violating good faith. That's something that is specifically negotiated. No, no, no. It's not specifically negotiated that AB could stipulate to the invalidity of the two patents. It was absolutely not specifically negotiated. You make the argument they could do that, but there's no language that says that. Well, the language is AB is authorized to enter into any settlement or judgment that involves any outcome, whether or not involving the payment of money, without the prior written approval. But that can't mean that they can stipulate that the two patents are invalid and should never have been granted. That's an absurd argument. Well, I think it has to be looked at in the context of AMF owning a significant share of AB. The royalties in this license agreement... Why does that have to do with it? Because what is in Advanced Bionics' interest is in AMF's interest. Maybe and maybe not. We can't make assumptions based on ownership. There's nothing in the record about the extent of control back and forth between these two entities because of cross-ownership. We've got an agreement and the predecessor agreement, and that's essentially all we have in front of us. That's all that Judge King relied on. That's correct. And so if we interpret it your way that, yes, AB could stipulate to the invalidity of the patents, then maybe you win. But I'm having a huge problem seeing how that can be squared with the duty of fair dealing of these two contracting parties that's plainly required by California law. Well, again, I think that when they negotiated that AB could enter any judgment, they were anticipating that things would come up, and they put that control entirely into his hands. Invalidity? Constipulate to judgment based on invalidity? Well, if you're uncomfortable with invalidity, they could stipulate to a judgment of no infringement or a judgment of zero damages on the past. Even if the infringement was clear? Well, I've yet to be in a patent case where there weren't arguments either way on infringement. Well, let's suppose that this is an unusual case, that the infringement was clear. They could stipulate to no infringement? Well, I suppose if they got to the point where there's, for example, a summary judgment of infringement, and they stipulated to no infringement just to cheat AMF out of the damages that would have accrued with some back payment, that that might violate the California rule on good faith dealing. Again, don't you have to go back in a case like that to the intention of the parties? We can argue about how words that might have been written differently, what they mean and what they say, when you put them in the worst possible light, but isn't the question what the parties intended? And isn't that what would have to be determined if we have this issue? You say they can stipulate to no infringement. Meanwhile, we have a contract in which the parties agree that if AB refuses to sue for infringement, AMF can. So there are tensions there that don't fit at all with the theory that AB could say, all right, I'm going to sue for infringement. They enter into the suit and then stipulate no infringement. I agree with that. It's the intention of the parties, and there could be parole evidence that would be useful in that regard. It may or may not be parole, I don't know. Excuse me? You say it may or may not be parole evidence. It would be something to be decided under the law of contracts of the jurisdiction. That's correct, Your Honor. Unfortunately, as a third party to this agreement, we don't have access to that information. You don't have access to something called discovery, right? This came up very late in discovery. Well, you have access to the information. You didn't try to get it, did you? We did ask about this agreement as to- Did you seek to depose the negotiators of the agreement? No, we did not. Did you seek discovery from the third party of any of the documents relating to the negotiation of the agreement? Yes, we did. We sought all those documents from the third party. As a matter of fact, the agreement that's in the record, we obtained from the third party. Did you get the documents? We got a letter. I think that was the only other document that we got. Did you seek to pursue any further documents? No, discovery closed, and we did not seek to pursue any further documents. It seems to me you can't complain about the lack of parole evidence to enlighten the interpretation of the agreement when you didn't put any such evidence before the court. I'm not complaining about the lack of parole evidence, Your Honor. I'm just noting that I don't know what that evidence is. Now, isn't it the case that Judge King found that the right of AMF to sue was mugatory because AB could license the defendant and totally defeat the lawsuit? I think that that is part of what he said, yes. Now, if he's wrong on that, don't we have to reverse? No, I don't believe so. Well, how could we affirm if he's wrong on that? Well, there are two reasons. First of all, I believe that the amount of control that is given to Advanced Bionics over the first right of litigation is substantial, so substantial that it essentially gives them the ability to negate infringement. The second thing… Wait, wait, wait. Don't go so fast. What do you mean negate infringement? I don't understand what you're saying. I'm sorry. I'm referring to what I said earlier, which is that they could stipulate to a judgment of no infringement, or they could enter a judgment of no damages for the past. Yeah, but isn't that all subject, as Chief Judge Michel was suggesting, to the covenant of good faith and fair dealing? It is. Right? They don't have absolute unfettered control over the lawsuit because they have to consider AMF's interests, right? Except those things that I just addressed, I think, are well within disagreement. No, but what's the issue with that? They have to consider AMF's interests, don't they? Only in situations outside of the control that AMF has intentionally transferred to Advanced Bionics. Yeah, but that's the question. How much control did they give them? Well, the agreement specifically said they can settle for a judgment without any money, so they at least gave them the control to wipe out liability for past damages. Well, in some circumstances, but maybe not in all. I can't think of any circumstances where they would not have that control. Where the infringement's clear. How about that? But still, the agreement specifically authorizes them to settle without any damages, so I think that even where the infringement is clear, they are authorized to ignore past infringements. Shouldn't that clause be read as if the words, where appropriate, appear? Settle for no money where appropriate, but not necessarily where it's totally inappropriate, like in the case of absolute slam-dunk clear infringement with major damages. I don't believe so, because that language is so explicit. Without the permission of AMF, any judgment without money... Of course the language is explicit, but it has to be read in the context of the covenant of fair dealing. It does, and the covenant of fair dealing applies where you violate what was intended to be the deal that the party set up. And here the deal that the party set up included AB's ability to settle for no money. So you wouldn't, under any circumstances in my view, violate the covenant of good faith and fair dealing by agreeing to settle for no money. Regardless of the facts? Regardless of the facts, because that's specifically what the legislation is. Then what does the covenant mean? If it doesn't put some common sense limits on what AB can do, then how does it have any effect here at all? I think it puts common sense limits in that if it's not something that has been explicitly agreed to, then there's this obligation of good faith to live up to the deal that you negotiated. But here the deal that they negotiated gives them the power to settle any litigation for no money. But we're talking about how to interpret the grant of power. And we're suggesting, at least I'm suggesting, that those words, those grants, have to be interpreted in light of the covenant. And you seem to be saying no, forget the covenant, it has zero impact, they can be as unfair as they want to be, because the language says they have control if they bring the suit. If it's explicitly addressed in the agreement, I do not believe that the covenant of good faith and fair dealing applies. What's your authority for saying that? It's the California case that the other side cited. I thought the covenant applied in every case, both to explicit provisions and gaps in an agreement. You had to be fair to your partner whether there was a specific provision or not. The case says, and I'm sorry I don't have the name right here, the case says that you have to be fair to what you negotiated, you have to be consistent with what you negotiated. And here they negotiated something specific, so I think their actions would be consistent with what was negotiated. So you would have us believe that AMF knowingly and intentionally gave AB the right to throw away cases by stipulating to non-infringement even if it was clear, stipulating to invalidity even if the patents were solid? Certainly stipulating to a judgment of no money. But even under your theory, they can't grant a license for no money, right? That's correct. I agree there's a tension between those two provisions. There's a tension between a lot of provisions in this agreement. You argued in your brief that the most that AMF has is a reversion of a right to sue. I couldn't see how you got there. It looked to me like they retained a right to sue in the event that AB elected not to sue itself. There's a big difference between something reverting on some condition and something being retained by the patent owner in the first place. That may have been a semantic error on our part, but it's retained only under certain circumstances that give AB control over when those circumstances occur. In our view, complete control over when those circumstances occur. But here, there's no doubt that AB elected not to sue the present defendant. That's correct. And therefore, the retained right to sue by AMF kicks in, right? That's correct. But then you go to court and say, no, their retained right isn't a right. They can't sue. Well, it's a question of when they've transferred all substantial rights. And here, even I think admittedly at this point, they transferred the first right to sue to Advance Bionics, and AMF is not required to join in any such suit, so they intended to transfer the right to AB to sue in its own name. Yeah, because they thought the covenant meant something. Otherwise, they would have been insane to enter into this agreement. Well, I do agree that there are problems with this agreement, but as I read the language, AB has control. It's a very convenient reading in the circumstance where you're the defendant in a case and the plaintiff is AMF, and where we know that AB has declined to sue. So AB can't sue, and AMF, you say, can't sue either, so you're scot-free. Well, AB could be joined in a suit, and they chose not to do that. I want to ask you an unfair question. Do you think AB can sue in its own name? Yes, I do. Without joining AMF? Yes, I do. Despite the various retained rights? That's correct, because I think AMF transferred all substantial rights to AB, which would make them a party that could sue in their own name. Why isn't the right to sue the only one we need to look at? If there are ten other rights that they conveyed, if they retained the right to sue, why doesn't that tell us they are still the owner? The issue here is, are they an owner, or are they a seller who now is no longer an owner? You say they sold it. They are no longer an owner, period. But if you can sue to exclude others from practicing a patent, it seems to me that leads to the conclusion you are still an owner. Well, they transferred the right to sue to AB. They retained a secondary right to sue. So the question is, how significant in this agreement is that secondary right to sue? Well, you're saying it's not a substantial right. It looks to me as the most substantial right that arises in patent law, the right to sue others to exclude them from practicing the patented invention. I agree with that, Your Honor, but they transferred that first right to AB. And I think that that's more significant, especially given the control they gave AB, which affects AMF's ability ever to exercise its secondary right. All right, let's hear rebuttal from Mr. Bodine. I think I heard a significant admission there by Cochlear, and that is that AB retained a right to sue before their position had always been that there would have to be a written agreement assigning the right back. But beside that, if we take Cochlear's position and accept it, then we'd have to go back and look at the asymmetrics case. In the asymmetrics case, as we point out in our brief, the retained right to sue is almost identical to the retained right to sue in this case. And yet in the asymmetrics case, the licensor was found to have retained substantial rights in the patent, and that is the secondary right to sue, the right after an election to sue for patent infringement. So that's my first point. And Judge King didn't have the benefit of that case, right, because it came out later. It came out after we had filed our opening brief. And therefore, long after Judge King wrote his opinion. Long after Judge King had written his opinion. The second point I'd like to address is the duty of good faith and fair dealing. And I think you have to look at the contract, 11.2, and this is at A624. 11.2 says that AB has the right to elect to control. And then 11.2.2 conditions their right to settle the case. And that is after consultation with AMF, AB is authorized to enter into settlements. So not only do we have the California duty of good faith and fair dealing implied, we have a specific consultation requirement in Section 11.3 that says you have to settle. If they're free to totally ignore the counsel of AMF, the fact that they have to be consulted is kind of hollow. Well, it's not. I think it's more than just consultation, Your Honor, because it says they can enter into agreements without the prior written approval of AMF. It doesn't say that they don't have to have approval at all. It says you have to consult with us, although we don't have to give you prior written approval. So you have to consult with us and consider our views. It's much like the clause in the asymmetrics case in which the views of Harvard had to be considered. And then I think the third thing, the control, there's a lot of confusion here between the right of control, the first right of control of the litigation and the right to sub license. And they occur at different times. And so if you look at Section 2.6, which grants the right to sub license, that right is only if there's no lawsuit. If there's a lawsuit that's been filed, then that right no longer exists. All right, time has expired. We thank you both for a thorough airing of the case. We'll take the appeal under advice. Thank you, Your Honor.